UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARTIN L. MANLEY,

        Plaintiff,

Case No. 1:11-cv-163

Hon. Gordon J. Quist

v.

HEIDI SMITH and TODD LAMBART,

        Defendants.

_____/

## REPORT AND RECOMMENDATION

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. This matter is now before the court on defendants' motion for summary judgment (docket no. 15).

**I.    Background**

Plaintiff's complaint named two defendants, Registered Nurses Heidi Smith and Todd Lambart. *See* Compl. as amended (docket nos. 1 and 10).[1] Plaintiff seeks damages and other relief for deliberate indifference to his serious medical needs in violation of the Eighth Amendment. Plaintiff set forth the following allegations. In 2006 he was diagnosed with varicose veins. *Id.* at p. 2. From 2006 through 2009, the Michigan Department of Corrections (MDOC) prescribed him Motrin and Tylenol for this condition. *Id.* In December 2009, his prescriptions ran out. *Id.* at pp. 2-3. Plaintiff sent kites requesting re-fills but he did not receive any additional medicine. *Id.*

---

[1] The court notes that plaintiff amended the complaint as a matter of right under Fed. R. Civ. P. 15(a)(1)(A), by submitting additional claims for compensatory damages on April 21, 2011. *See* docket no. 10. The court addressed the amended claims in a separate order entered this day. Because all of the operative allegations are set forth in the original complaint, and plaintiff did not submit a separate amended complaint incorporating the damage claims, the court will refer to the allegations as set forth in the original complaint.

Then, plaintiff was transferred to the Richard M. Handlon Correctional Facility (MTU). *Id.* at p. 3. Upon his arrival at MTU, plaintiff informed the intake nurse that he required a Motrin re-fill for the pain and swelling of his varicose veins in his left leg. *Id.* The nurse told him to wait for the prescription to transfer to MTU. *Id.* After some weeks, having not received a re-fill, plaintiff called health care regarding the pain in his leg. *Id.* An unidentified nurse gave him a different kind of varicose vein stocking and told plaintiff that a doctor's appointment would be scheduled. *Id.* Weeks passed and plaintiff did not see a doctor. *Id.* at pp. 3-4.

Plaintiff sent a kite to healthcare requesting Motrin because the pain medicine available at the prison store did not stop the pain or swelling. *Id.* at p. 4. Defendant RN Heidi Smith responded to the kite, stating that the available medication (ibuprofen) was Motrin and that the there was no difference between the medications and that plaintiff could order Tylenol and Motrin from the prison store. *Id.* Plaintiff alleged that RN Smith's actions delayed his access to medical care and "caused him to continue to experience very bad pain." *Id.* While plaintiff does not allege the date of his kite or RN Smith's response, his medical records reflect that RN Smith responded to a kite on August 5, 2010. *See* RN Smith Kite Response (Aug. 5. 2010) (docket no. 17 at p. 8).

On August 10, 2010, plaintiff filed a grievance "on the matter" and discussed the grievance with defendant RN Todd Lambart. Compl. at p. 4. At that time, plaintiff informed Lambart that he was experiencing "very bad" pain in his leg, that the swelling would not go down and asked if Lambart would provide him with Motrin. *Id.* Lambart denied the request. *Id.* Plaintiff asked when he would be seen by a doctor, to which Lambart responded that the doctor was on vacation and that plaintiff would be scheduled to see him at a future date. *Id.* at pp. 4-5. Plaintiff alleged that Lambart's actions delayed his access to medical care by failing to provide medication

and/or to schedule a doctor's appointment, causing plaintiff to suffer "very bad pain" for two weeks. *Id.* at p. 5. Plaintiff also alleged that RN Lambart lied on the response to his grievance, with the following statements being false: plaintiff had failed to show up at a medical provider (MP) appointment on July 14, 2020; plaintiff was re-scheduled to see the MP later in the month; plaintiff was comfortable with the plan; and plaintiff verbalized understanding of the plan. *Id.*

After a month had passed, plaintiff was seen by non-party RN Thurs, who examined plaintiff's leg, said he would provide Motrin to plaintiff, and that plaintiff would see a doctor. *Id.* at p. 6. RN Thurs also told plaintiff that the reason he had not been seen by a doctor was becuase the doctor had surgery. *Id.* When the doctor examined plaintiff, he advised plaintiff that the pain medication health care had been providing should not have been discontinued, that "varicose veins can only be treated with [] quality pain medication," and that plaintiff would receive Motrin, Tylenol and a circulation medication. *Id.*

## II.     Defendants' motion for summary judgment

### A.     Legal Standard

Defendants have moved for summary judgment on various grounds, including failure to exhaust administrative remedies. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d  at 478-79 (citations omitted).  "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party."  *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  However, the court is not bound to blindly adopt a non-moving party's version of the facts.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.      **Failure to exhaust**

#### 1.      **Exhaustion requirement**

The PLRA,  42 U.S.C. § 1997e, provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies.  *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001).  A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to

obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. One reason for creating prisoner grievance procedures under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record.

*Jones v. Bock*, 549 U.S. 199, 204 (2007). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Id.* at 218; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218.

### 2. MDOC grievance process

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130 (effective July 9, 2007). A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the giveable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ P. If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff. *Id.* at ¶¶ P and R. The Policy Directive provides the following directions for completing grievance forms:

> The issues shall be stated briefly but concisely. Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ R (emphasis in original). The prisoner must send the Step I grievance to the appropriate grievance coordinator. *Id.* at ¶ V. If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator. *Id.* at ¶ BB. Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section. *Id.* at ¶ FF.

### 3. RN Lambart was not the subject of a grievance

Defendants have identified one grievance which relates to plaintiff's claim, MTU 10080-0854-012f ("854"). *See* Grievance 854 (docket no. 16-4). This grievance, dated August 10, 2010, grieved an unnamed female nurse (who was later identified as RN Smith). *Id.* According to plaintiff, the nurse told him that the Motrin prescription had been discontinued "because the state was trying to save money." *Id.* The grievance does not name defendant RN Lambart, whose only interaction with plaintiff was providing a response to the grievance. In his brief in opposition to defendants' motion, plaintiff acknowledged that he did not name RN Lambart in the grievance. *See* Plaintiff's Brief at p. 7 (docket no. 25). Nevertheless, plaintiff contends that RN Lambart delayed plaintiff's access to medical care when Lambart denied the grievance. *Id.* A prison official whose only role involved the denial of an administrative grievance cannot be liable under § 1983. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "The mere denial of a prisoner's grievance states no claim of constitutional dimension." *Alder v. Correctional Medical Services*, 73 Fed. Appx. 839, 841 (6th Cir. 2003). *See Martin v. Harvey*, 14 Fed. Appx. 307, 309 (6th Cir. 2001) (observing that the denial of an appeal of a grievance complaining of inadequate medical care is not the same as the

actual denial of a request to receive medical care). Accordingly, RN Lambart's motion for summary judgment should be granted.

### 4. Plaintiff failed to properly exhaust a grievance against RN Smith

It is undisputed that plaintiff exhausted grievance 854 through Step III. However, the record reflects that plaintiff did not *properly* exhaust the grievance as required by the MDOC Policy Directives and the PLRA. Plaintiff was unsatisfied with the Step I grievance response provided by RN Lambart, and filed a timely Step II appeal on August 25, 2010. *See* Grievance 854. The grievance was denied at Step II by Mr. Alfred Jones, Administrative Assistant, Region III Health Care Administration, on October 25, 2010. *Id.* The record reflects that this response was returned to plaintiff on October 29, 2010. *Id.* The Step III response reflects that plaintiff's Step III appeal was to be received by November 13, 2010. *Id.* However, because plaintiff did not file the Step III appeal until January 4, 2011 (about 1 1/2 months late), the MDOC rejected the Step III appeal as untimely, noting that "[t]he grievant does not provide appropriate support for this delay." *Id.*

Plaintiff disputes that it was late, and has presented a letter from Richard Russell, Acting Manager of Grievance and Appeals at the MDOC, dated December 16, 2010, which advised plaintiff that his Step III appeal was being returned to him for the following reason, "[y]ou must include a readable/completed Step I Grievance Form (CSJ-47A)." Russell Letter (Dec. 16. 2010) (docket no. 25-1). The letter further stated that "[u]pon completion of the above noted items your Step III appeal will be responded to in accordance with PD 03.02.130." *Id.* The letter did not advise plaintiff of the due date for re-filing the Step III appeal.

7

Genuine issues of material fact exist as to whether plaintiff properly exhausted a grievance against RN Smith. *See, generally, Jones*, 549 U.S. at 218; *Woodford*, 548 U.S. at 90-91. Viewing the evidence in the light most favorable to plaintiff, the record reflects that plaintiff submitted a Step III grievance sometime before December 16, 2010 (and well before January 4, 2011). The MDOC did not reject this appeal as untimely. Rather, on or about December 16, 2010, the MDOC returned the appeal to plaintiff with instructions to include an additional form with the appeal, but absent instructions as to the due date for re-filing the appeal. When plaintiff re-filed the Step III appeal on January 4, 2011, the MDOC rejected it as untimely, on the basis it should have been received by November 13, 2010. This record raises two issues of fact germane to determining exhaustion. First, a genuine issue of fact exists as to when plaintiff filed the original Step III appeal. It is difficult to conceive that plaintiff filed the original Step III appeal on or before November 13, 2010, and that the MDOC did not respond until more than one month later (December 16, 2010), but defendants have not presented evidence establishing the actual filing date. A second issue exists regarding whether the MDOC waived an objection to timeliness when it allowed plaintiff to re-file the Step III appeal, which he did on January 4, 2011. Accordingly, RN Smith's motion for summary judgment on grounds of lack of exhaustion should be denied.

### C. Eighth Amendment claim

Assuming that plaintiff properly exhausted grievance no. 854, he has failed to establish that RN Smith violated his Eight Amendment rights. Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96

F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (l976). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Hudson*, 503 U.S. at 8-9. With respect to the infliction of serious pain, courts recognize that "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 8 (internal citations and quotation marks omitted). Similarly, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the

9

subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

Plaintiff contends that RN Smith's actions resulted in a delay in treatment in violation of his Eighth Amendment rights. To succeed on a claim that an alleged delay in medical treatment rose to the level of an Eighth Amendment violation, a prisoner "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison County, Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) (delay in dialysis treatment).

Plaintiff's medical records reflect that, on January 27, 2010, seven months before the alleged incident, Maurice Potts, M.D, a physician at the St. Louis Correctional Facility (SLF), declined plaintiff's request for a re-fill of a Motrin prescription, stating that plaintiff "can purchase motrin 200 mg at the store and take two tabs bid prn." MDOC Progress Note (Jan. 27, 2010) (docket no. 17 at p. 3). Plaintiff had objected to the doctor's orders while at SLF, requesting that SLF Health Care re-order 400 mg of Motrin and stating that "the store meds do not work." *Id.* at p. 4. In a kite response from non-party RN Judy Davis, the nurse advised plaintiff of the doctor's decision regarding this medication:

> The doctor reviewed your chart and he advised that you are to buy Ibuprofen 200mg tablets from the store and take two tablets two times per day as needed for pain. Motrin is the same medication as the ibuprofen in the store and if you take two of the ibuprofen from the store it is the same thing as taking one 400 mg of Motrin.

10

RN Davis Kite Response (Jan. 27, 2010) (docket no. 17 at p. 4).

After transferring to MTU, plaintiff apparently resurrected his complaint regarding the doctor's order that he purchase ibuprofen from the prison store. The kite response from RN Smith, on which plaintiff's entire lawsuit is based, provides as follows:

> Call details: Was getting Motrin from Health Care for pain in my legs, then you told me to go by [sic] my own from the store. The store Motrin doesn't help. Wants the Motrin HC [Health Care] was giving him. Call comments: Motrin is Ibuprofen, it is the same thing. There is no difference between the Motrin in your store to [sic] the Motrin that Health Care once gave you. If you want Motrin\Tylenol etc [sic] you need to purchase that from your store.

RN Smith Kite Response (Aug. 5, 2010).

In her affidavit, RN Smith explained her brief interaction with plaintiff. She was employed as a Registered Nurse at MTU, where she was responsible for assessing and triaging patients. Heidi Smith Affidavit at ¶¶ 1-3 (docket no. 16-2). RN Smith "did not perform any direct care to prisoner Manley." *Id.* at ¶ 7. She did respond to a health care request from plaintiff, in which plaintiff claimed "that Ibuprofen in the store did not help as well as Motrin given by health care." *Id.* at ¶ 4. RN Smith noted that "[t]he medication stocked in the store and health care is Ibuprofen, the generic brand of Motrin." *Id.* Based "on a chart review of plaintiff's medical record which shows documentation from a previous medical practitioner who directed patient to purchase medication from his store," she instructed plaintiff purchase ibuprofen from the store. *Id.* at ¶¶ 4-5.

The only contact between plaintiff and RN Smith was plaintiff's request that he be provided a name-brand pain reliever from Health Care rather than the generic form of the pain reliever available at the prison store. RN Smith responded to this routine request based upon plaintiff's medical records. Indeed, the record reflects that plaintiff raised the same complaint when Dr. Potts changed the prescription in January 2010. This kind of request can hardly be described

as rising to the level of a constitutional violation, or any violation at all. If anything, it reflects plaintiff's misunderstanding of generic drugs. In addition, plaintiff has failed to present any verifying medical evidence in the record to establish a "detrimental effect" which resulted from him having to take the generic form of Motrin.

Furthermore, there is no evidence that RN Smith was deliberately indifferent to plaintiff's serious health needs. The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976). This action falls in the latter category. "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id. See Owens v. Hutchinson*, 79 Fed. Appx. 159, 161 (6th Cir. 2003) ("[a] patient's disagreement with his physicians over the proper medical treatment alleges no more than a medical malpractice claim, which is a tort actionable in state court, but is not cognizable as a federal constitutional claim"). RN Smith did not deprive plaintiff of any treatment. Following the doctor's orders, she did nothing more than advise plaintiff (for the second time) that the Motrin prescribed by Health Care was the same medication as the ibuprofen available at the prison store. RN Smith is certainly entitled to summary judgment.

### III.     Recommendation

For the reasons set forth above, I respectfully recommend that defendants' motion for summary judgment (docket no. 15) be **GRANTED** and that this case be dismissed.

Dated:  February 14, 2012                          /s/ Hugh W. Brenneman, Jr.
                                                                        HUGH W. BRENNEMAN, JR.
                                                                        United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).